Plaintiff instituted this suit seeking to recover $20,000 from defendant as damages for the loss of his right arm, which he alleged was caused by defendant's train running over him in the early morning of August 2, 1942. He alleged that at about 4 o'clock a.m. on the above date, he was walking on the cross-ties of a sidetrack in the City of Tallulah, Louisiana, and in a northeasterly direction. When he reached a point 150 feet northeast of where Highway No. 80 crosses the railroad track, defendant's train, consisting of an engine and a number of flat cars, which was being backed in a northeasterly direction, ran against him, knocking him down and the wheels of the flat car or cars severed his right arm from his body; that at the time the engine of said train was headed in a southwesterly direction and the rear of said engine was attached to the cars which were being pushed in a northeasterly direction. Plaintiff further alleged that no warning of any kind was given by the train crew either by sounding the whistle or ringing the bell; and that it was very dark and there were no lights on said train.
Defendant admits its train ran over plaintiff and severed his arm from his body, but denies any negligence on its part or the part of the train crew. It denies all other material allegations of plaintiff's petition. The lower Court, in a well-written opinion, rejected plaintiff's demands and he is now prosecuting this appeal.
Plaintiff's own testimony is all he offered to substantiate the allegations of his petition and when taken in the light of the other testimony in the case, which is most convincing, causes us to conclude that plaintiff does not know anything that occurred before the train ran over him and cut off his arm.
There are two side-tracks leading into defendant's sawmill, which is located in the City of Tallulah, Louisiana. On the morning of the accident, there were nine car-loads of logs on the south side-track of the track destined for defendant's mill, which was southwest of the place where the cars were. There were no cars on the north side-track. Sometime between 1 and 4 o'clock a.m., defendant's engine, headed northeast on the north track, went to the switch where the two side-tracks come together and then backed southward on the south track to where the nine cars of logs were situated. It coupled onto *Page 893 
the log cars and pulled six of them back to the switch and then backed them into the mill-yard, on the north side-track. The engine and its crew remained at the mill for a considerable length of time and then the engine was driven back to the switch and then backed into where the three remaining cars of logs were situated. It coupled to the three cars and remained stationary there until the switchman, with lantern in hand, had gone to the crossing with Highway 80 to flag traffic. When he arrived there he signalled the engineer, who backed the three cars into the mill-yard on the south side-track. After arriving at the mill, some one came and notified the train crew that a man had been run over by the train. The crew returned to where the three cars had been stationed and found plaintiff with his arm cut off. He had no shirt on and only one shoe. Plaintiff's arm was severed by the wheels of the cars on the north rail of the south track, and the blood on the rails and ground showed the accident had occurred at a point exactly where the middle one of the three cars had been parked before being moved by the engine. The next morning plaintiff's shirt and shoe were found on the middle car.
The record discloses that each time the car crosses the highway the whistle was sounded, and the bell, which was operated by electricity, continued to ring during the entire time of switching. When the engine was moving on this morning a switchman was always on the front end of it, that is, the forward end of the engine, whether it was moving forward or backward. When the cars were attached to the engine, the switchman was on the end of the front car and his lantern was lighted. When the engine was coupled to the three cars on the south track, the switchman, after making the coupling, walked down the south side of the track to the end of the last car and then continued down the track to the highway crossing. He carried his lantern and did not see any one on the track. He is sure if any one had been on the track, he would have seen him. If plaintiff was lying down under the middle car or on the north side of the track near the middle car, it is only natural that he would not have been seen and the evidence convinces us that plaintiff was at that place. We are also convinced from the evidence that plaintiff was drinking on the morning of the accident. Why he was partially undressed is not exclaimed, except that the engineer and other members of the crew when backing the six cars of logs into the mill-yard, saw a man come out of the house on the north side of the track undressed. When they came back for the three remaining cars sometime later, he was not in sight. A reasonable theory is that he crossed to where the three cars were on the south track, partially dressed himself, when he fell asleep and did not wake until he had been run over by the train.
Plaintiff alleged and testified he and the train were traveling in a northeasterly direction, or away from the mill, when he was struck by the log car. The evidence is conclusive that the engine with the cars in front of it did not at any time that night travel in a northeasterly direction, but only in a southwesterly direction toward the mill. Plaintiff testified at one time he was walking on the cross-ties when struck and at another that he was in the middle of the track. While in the sanitarium and soon after the accident, plaintiff told a nurse and the City Marshal of Tallulah that he had been knocked in the head and robbed of $90 and placed on the tracks. After an investigation by the Marshal without finding any evidence of a crime, plaintiff told him he had been drinking that morning and did not know what had happened to him. As a witness, he testified that he was in the middle of the track when struck by the car; and that it knocked him down and cut his arm off. He said it rendered him conscious (meaning unconscious) and as soon as he came to he proceeded to run on his all-fours under the cars and actually outran the moving train and got out from under it. Plaintiff was asked who else was present, and he replied, — "No one but me and Jesus". We feel sure that if he was able to outrun the train on his all-fours with one arm cut off, he did have the help of Jesus.
It is our opinion that when plaintiff said that the train ran over him and cut his arm off it rendered him "conscious", he was telling the truth literally and that up until that time, he was totally unconscious in his drunken slumber.
The record fails to disclose any neglect on the part of defendant, unless we could hold that it was the duty of the train crew to look under every car stationed on a *Page 894 
side-track before moving the car. The law does not require that this be done and defendant was not negligent because the train crew failed to do so.
There is no error in the judgment of the lower Court and it is affirmed, with costs.